AO 91 (Rev. 08/09)  Criminal Complaint

FILED

# UNITED STATES DISTRICT COURT

### for the

2015 APR -8 P 3: 25

Northern District of California

RICHARD W. WIEKING
U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**MAG**

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| MABEL LEONG | ) 3  15  70450  EDL |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___November 28, 2011___ in the county of ___San Francisco___ in the
___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 United States Code § 1957 | Money Laundering |
| | Maximum Penalties: 10 years' imprisonment, $250,000 fine (or twice the value of the amount of criminally derived property in the transaction; 3 years' supervised release; $100 special assessment |

This criminal complaint is based on these facts:

Please see attached affidavit of DEA SA Jared Lindley in support of Complaint.

(approved as to form _____ AUSA Kevin Barry)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jared Lindley, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___Apr 8, 2015___

_____
*Judge's signature*

City and state: ___San Francisco California___         Hon. Elizabeth D. Laporte, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF DEA SPECIAL AGENT JARED LINDLEY
## IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jared Lindley, having been duly sworn upon oath, hereby depose and state:

### INTRODUCTION

1.      I submit this Affidavit in support of a Criminal Complaint alleging that MABEL

LEONG (a.k.a. Mabel Thuc Anh Co LEONG, a.k.a Mabel Thucanhco LEONG) did willfully

and knowingly commit an offense under Title 18, United States Code, Section 1957 – money

laundering.

2.      The facts stated in this Affidavit are based on my personal knowledge, on my

review of reports prepared by other law enforcement officers and records prepared by others, and

on conversations I have had with other law enforcement officers and witnesses involved in this

investigation.  I have not set forth each and every fact learned during the course of this

investigation in this Affidavit.  Rather, I have set forth only those facts that I believe are

necessary to support the lawful arrest of the individual listed in this Affidavit.  Unless otherwise

indicated, where actions, conversations and statements are related herein, they are related in

substance and in part only.

### AGENT BACKGROUND

3.      I am an investigative or law enforcement officer of the United States as defined in

Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations and to make arrests for offenses enumerated in Title

21, United States Code.

4.      I have been employed by the Drug Enforcement Administration (DEA) as a

Special Agent since 2012 and am currently assigned to the San Francisco Field Division,

1

Oakland Resident Office, where I am assigned to the Tactical Diversion Squad. While serving as a Special Agent for the DEA, I have participated in investigations of illicit drug trafficking organizations. Prior to working as a DEA Special Agent, I attended and graduated from the DEA Basic Agent Training Program in Quantico, Virginia. At the DEA Basic Agent Training Program, I received several hundred hours of comprehensive, formalized instruction in the recognition, distribution, manufacturing, and packaging of controlled substances, as well as money laundering techniques, asset forfeiture, and the diversion of pharmaceutical drugs.

5.      Prior to attending the DEA Basic Agent Training Program, I was employed with the Lawrence Police Department as a Detective for five years and with the Indiana University Police Department as a Patrol Officer for five years. Prior to working as a Patrol Officer, I attended The Indiana Law Enforcement Training Academy where I received several hundred hours of comprehensive, formalized instruction in the duties of a patrol officer, and in state and municipal law.

6.      I have spoken to, and worked with, more experienced federal, state, and municipal agents and officers in connection with my work as a DEA Special Agent, Lawrence Police Detective, and an Indiana University Police Officer. In the course of my investigative experience as a DEA Special Agent, I have developed experience in the use of confidential informants, wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. The investigations in which I have participated have included such issues as the possession with intent to distribute and distribution of controlled substances, the conducting of monetary transactions involving the proceeds of specified unlawful activities and use of monetary instruments to launder those proceeds, and conspiracies associated with criminal narcotics offenses.

## APPLICABLE LAW

7.     Title 18 United States Code, Section 1957 makes it a crime to engage in financial transactions greater than $10,000 where the transaction involved criminally derived property. The elements of the offense are as follows:

      a.   The defendant knowingly engaged in a monetary transaction;

      b.   The defendant knew the transaction involved criminally derived property; and

      c.   The property had a value greater than $10,000;

      d.   The property was, in fact, derived from a specified unlawful activity, in this case, distribution of controlled substances and conspiracy to do so, and

      e.   The transaction occurred in the United States.

## FACTS ESTABLISHING PROBABLE CAUSE

**Background**

8.     The Oakland Drug Enforcement Administration (DEA) Oakland Resident Office (ORO) Tactical Diversion Squad (TDS) investigated a physician in San Francisco who was selling prescriptions for the narcotic painkillers oxycodone and hydrocodone for cash, with no medical justification.  The physician was Dr. COLLIN LEONG.

9.     For instance, agents learned that a person named Rashid ISLAM was recruiting homeless people to obtain prescriptions for oxycodone written by Dr. LEONG in San Francisco. These people would then get their prescriptions filled, and in exchange for payment, would turn over the medication to ISLAM.  A search of ISLAM's residence revealed hundreds of empty prescription bottles for oxycodone, all of which were prescribed by LEONG.  The majority of these bottles that that only been filled within the few months prior to the search.  ISLAM subsequently pleaded guilty before Judge Alsup to conspiring to possess with intent to distribute

3

oxycodone and hydrocodone, including over 1,350,000 milligrams of oxycodone (45,000 oxycodone 30 mg pills). *See* CR 13-0207 WHA.

10.     In addition to prescriptions issued to the people ISLAM recruited, LEONG issued prescriptions for oxycodone and hydrocodone under the names of numerous people provided to LEONG by an undercover agent during a controlled purchase. LEONG sold those prescriptions to the undercover agent without ever seeing the people for whom the prescriptions were issued, let alone providing any medical examination or diagnosis.

11.     Dr. LEONG had been engaged in the illegal sale of prescriptions for controlled substances since at least 2007, knowing that there was no medical necessity for those prescriptions, and that much of the controlled substances acquired through those prescriptions would be sold to others. People purchasing prescriptions from Dr. LEONG would supply the doctor with names for which the prescriptions should be written, and Dr. LEONG generally charged between $80 and $150 per prescription.

12.     In the past five years alone, law enforcement discovered Collin LEONG prescribed approximately 1,020,176 tablets of Hydrocodone by writing 6,261 unlawful prescriptions. In addition, Collin Leong prescribed approximately 989,596 tablets of Oxycodone through 5,063 unlawful prescriptions.

13.     On September 23, 2013, the Honorable Nathanael Cousins, U.S. Magistrate Judge, issued an Arrest Warrant for Collin LEONG for 21 U.S.C. § 846 - Conspiracy to Possess with Intent to Distribute a Controlled Substance and 21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute a Controlled Substance. He was arrested the following day, on September 24, 2013. He was eventually indicted by the Grand Jury and charged in a number of conspiracy

4

counts under 21 U.S.C. § 846 together with several individuals to whom he sold significant quantities of prescriptions. *See* Case No. CR 15-0127 WHO.

      14.      Following the arrest of Dr. LEONG, he along with his counsel proffered with the government on October 3, 2013 and again on October 11, 2013. During those proffers, Dr. LEONG identified various co-conspirators who paid for and received fraudulently issued prescriptions as well as the methods employed to both transmit those prescriptions and receive the resulting payments from them. Dr. LEONG stated that in all instances of the prescriptions dispensed under his signature for oxycodone and hydrocodone were not for a legitimate medical purpose and were in fact fraudulently issued.

      15.      Dr. LEONG estimated that he made well over $400,000 from selling prescriptions for cash and that his wife, Mabel LEONG, handled all of the finances for his medical practice.

      16.      Analysis of prescriptions issued by Dr. LEONG and filled at pharmacies indicates that the volume of prescriptions filled – at $80 to $100 per prescription – would generate significantly more than $400,000 in cash.

**MABEL LEONG's Participation in Money Laundering**

      17.      Dr. LEONG told law enforcement that Mabel LEONG was an employee of his medical office that mainly handles human resources related issues related to hiring/firing. He also claimed that Mabel LEONG had no knowledge or involvement in his criminal conduct. As presented below, however, the financial transactions and other activity in which she engaged indicate an effort to launder cash, particularly when combined with the significant amount of cash Dr. LEONG's illicit prescription sales generated. On this basis, there is probable cause to infer that MABEL LEONG knew the funds at issue were criminally derived.

A.     **Significant Cash Deposits Into LEONG Accounts**

18.     Analysis of Dr. LEONG's and MABEL LEONG's bank accounts indicates significant cash deposits:  between February 2008 and September 2013, there was over $360,000 in cash deposited into MABEL LEONG's individual account; between January 2009 and September 2013, there was over $98,000 in cash deposited into a joint account held by Dr. LEONG and MABEL LEONG; between January 2009 and September 2013, there was over $66,000 in cash deposited into Dr. LEONG's individual account; and for the short period of time from December 2009 to May 2010, over $18,000 in cash was deposited into an account for "Mabel Leong's Beauty Consultancy."  This cash was eventually moved to an account in the name of MABEL LEONG's mother, Yen Co.  (*See* below.)

19.     Agents spoke with an employee of Dr. LEONG's medical practice ("Employee 1") who discussed the way cash was handled in the office.  Employee 1 indicated that MABEL LEONG directed her to take cash received from the medical practice and to deposit it into MABEL LEONG's bank account.  (At other times, MABEL LEONG directed Employee 1 to purchase groceries for the LEONGs with that cash.)

20.     Based on my training and experience, on the results of the investigation into Dr. LEONG and MABEL LEONG, and based on the facts below, I believe that this cash represented proceeds from Dr. LEONG's sales of prescriptions for oxycodone and hydrocodone.

B.     **Suspicious Bank Accounts**

21.     The "Mabel Leong's Beauty Consultancy" bank account, which received over $18,000 in cash deposits from December 2009 to May 2010, raised suspicions that it was being used to launder proceeds from prescription sales for the following reasons.  First, the cash deposits were not in small amounts, such as $250 or $300, which could indicate the cash was for

6

services rendered to a customer for a consultation. Rather, they were in increments of thousands

of dollars. Second, the account received no checks from any customers. The only check

deposits were from Dr. LEONG's medical practice. Third, there were no records that any

expenses were paid out of this account, such as to suppliers or advertisers, for rent, or for any

other type of expenses. Third, the account was in existence only for a short time. Based on my

training and experience and consultation with other investigators, I believe that the account was

short-lived because the LEONG's were concerned about creating a tax issue by having

unexplained income reflected in the account. (*See* below for a discussion of tax issues.)

Eventually, the money in this account was moved to an account in the name of Yen Co.

22.    MABEL LEONG set up two bank accounts in the name of her mother, Yen Co,

but I believe that MABEL LEONG controlled these accounts and that she used the Yen Co

accounts to disguise the source of the cash that was funneled into them. On September 19, 2012,

two bank accounts were established at the Broadway/Grant branch of Wells Fargo Bank in the

name of Yen Co with Mabel LEONG having Power of Attorney.

23.    An examination of the account opening documents reveal that the date of birth

listed for Yen Co is actually Mabel LEONG's date of birth. In addition, Yen Co's address is

listed as 1838 Lawton Street, San Francisco, CA. The account application indicates that Yen Co

had resided at this address for the past 12 years and 8 months. (*See* ¶ 26 for a discussion of Yen

Co's residence.) The application also lists this address as MABEL LEONG's address. The

application has Yen Co's home telephone listed as (415) XXX-X866. This is actually Mabel

LEONG's cellular phone.

24.    To indicate that Yen Co was actually present to open the account, the application

paperwork states that Yen Co used a Bank of America debit card as a secondary form of

identification.  However, Bank of America records fail to establish that Yen Co ever had a bank account with that institution, and therefore, Yen Co would not have an associated debit card tied to an account at that bank.  By contrast, Mabel LEONG has maintained several accounts with Bank of America over the years.

25.      As part of the process for opening the Yen Co account, Wells Fargo Bank also completed a Substitute Form W-8BEN, which is a certificate of foreign status of beneficial owner for US tax withholding.  The W-8BEN bears the alleged Chinese logogram (signature) of Yen Co acting in the capacity of "self."  This indicates that Yen Co was purportedly in the United States to make the signature.  Attached to the W-8BEN was a copy of Yen Co's alleged Hong Kong passport.  The form indicates that it was filled out in person, but it likely was faxed to the bank from an unknown number.  The copy of the passport is of poor quality, and the photograph on the alleged passport is impossible to read, possibly by design.

26.      Although it appears from the paperwork that Yen Co appeared in person to present identification and fill out the materials to open the Well Fargo account, U.S. Customs and Border Protection has no record of Yen Co ever entering the United States.  (In a proffer session with the government, Dr. LEONG himself stated that Yen Co has never been to the United States and currently lives in Hong Kong, China.)

27.      Thus, I believe that Yen Co was not physically present and did not sign the account opening application, but rather that Mabel LEONG forged Yen Co's signature and faxed the W-8BEN back to Wells Fargo Bank, likely from the LEONG medical practice.

28.      I believe that the reason to create the Yen Co bank account was to provide a "clean account" to launder Dr. LEONG's illegal prescription proceeds.  Agents traced the cash deposits into Dr. LEONG and MABEL LEONG's individual and joint accounts, as well as into

8

the "Mabel Leong's Beauty Consultancy" account. They then saw that money transferred into the Yen Co account. This money – the likely prescription proceeds – was then combined with an infusion of additional funds from Hong Kong (roughly $1 million) to purchase a $1.6 million piece of property in Millbrae, California in July 2013. Anyone viewing the source of the funds to purchase that property would see that it came from the Yen Co account, and not that a substantial portion of it originally consisted of cash deposits.

C.      **The IRS Tax Liens and Circular Payments to the Source of Information**

29.     In 2004 and 2005, the Internal Revenue Service filed liens against properties owned by Dr. LEONG and MABEL LEONG.

30.     As discussed below, there is probable cause to believe that the LEONG's used the existence of the tax liens as a means and excuse to convince others to allow MABEL LEONG to use their U.S. bank accounts to launder drug-related proceeds.

31.     Agents spoke to a Source of Information ("SOI") who knows Dr. LEONG and MABEL LEONG. The SOI was subpoenaed to appear before the Grand Jury to discuss the SOI's connection with the LEONG's and to discuss the SOI's bank records. The SOI agreed to speak with agents instead of appearing before the Grand Jury. The SOI has not been charged with any crime and received no consideration for any testimony. Information provided by the SOI has been corroborated by other interviews and bank records.

32.     The SOI was approached by MABEL LEONG prior to March 2010 and asked by MABEL LEONG to provide fictitious loans to Dr. LEONG, ostensibly for the purpose of addressing serious tax problems the LEONG's were having. MABEL LEONG told the SOI that MABEL LEONG's family had provided funds to help satisfy the tax issues, but MABEL

9

LEONG claimed that if she gave the money directly to Dr. LEONG, he would not feel obligated to pay MABEL LEONG back. Therefore, MABEL LEONG asked the SOI to enter into a ruse.

33. The idea was for the SOI to make it appear that the funds were coming from the SOI (and not MABEL LEONG) because Dr. LEONG would be more inclined to pay the money back to the SOI. MABEL LEONG explained to the SOI that the SOI would not be out any money. MABEL LEONG would pay the SOI; the SOI would pay Dr. LEONG; Dr. LEONG would pay the SOI; and then the SOI could give the money back to MABEL LEONG.

34. MABEL LEONG directed the SOI never to mention this arrangement to anyone, and never to mention it to Dr. LEONG.

35. Although there were a number of transactions made according to this "loan" arrangement between MABEL LEONG and the SOI prior to those outlined below, the first set of transactions over the $10,000 threshold required by 18 U.S.C. § 1957 are as follows:

| March 16, 2010 | Bank of America (BoA) Checks #1004 & #1005, payable to Mabel Leong (cashed) and the SOI, funded by BoA Bank Account No. XXX1918 (Leong's Beauty Consultant), Deposited to BoA Bank Account XXX2513 (the SOI and a third person) as a combination of cash and check | $11,000.00 |
| March 17, 2010 | Deposit of BoA Check #277 funded by BoA Bank Account XXX2513 (the SOI and a third person) to BoA Bank Account XXX9734 (Collin Leong MD) | $11,000.00 |

36. The payments from Dr. LEONG back to the SOI were made in smaller increments, $2,000 to $3,000, and they took place over a number of days or weeks. The notation on Dr. LEONG's repayment was "Repayment of partial loan."

37.     Although the circular "loan" payments from MABEL LEONG to the SOI, to Dr. LEONG, and back again were supposedly to address the LEONG's tax issues, there was only a single tax lien in place at this time, and it was released in March 2011, well before the series of transactions below.

38.     The next series of transactions above the $10,000 threshold took place in November 2011, as follows:

| November 28, 2011 | BoA Check #118 issued payable to the SOI, funded by BoA Bank Account XXX5331 (Mabel Leong) | $12,000.00 |
|---|---|---|
| November 28, 2011 | Deposit of Check No. #118 into BoA Bank Account XXX2513 (the SOI and a third person) | $12,000.00 |
| November 29, 2011 | BoA Check #304 issued payable to Collin Leong, funded by BoA Bank Account XXX2513 (the SOI and a third person) | $12,000.00 |
| November 29, 2011 | Deposit of Check #304 into BoA Bank Account XXX9600 (Collin & Mabel Leong) | $12,000.00 |

39.     As with the prior series of transactions, Dr. LEONG paid off the "loan" with transactions that were less than $10,000: a $6,000 check from Dr. LEONG to the SOI (with "loan" on the memo line) on December 5, 2011; and a $6,000 check from Dr. LEONG to the SOI on January 5, 2012.  In both instances, the SOI immediately paid back this money to MABEL LEONG, completing the circle.  All of the transactions above took place in the United States

40.     The SOI never physically presented Dr. LEONG with any of the issued checks. Rather, the SOI provided them directly to MABEL LEONG to present or deposit to the medical

practice's account. Further, there was never any interest or additional payments associated with the loans; there were only dollar for dollar "repayments."

41.     During the period when the transactions above and similar smaller transactions were taking place, the SOI had the opportunity to see Dr. LEONG socially. Despite the fact that the SOI was ostensibly assisting Dr. LEONG with a serious tax issue by repeatedly loaning him substantial sums of money, Dr. LEONG never discussed any terms of the loans with the SOI, never asked the SOI why the SOI was willing to loan him the money, never professed any thanks for the loans, and never mentioned them in any way.

42.     Based on my training and experience, based on my discussions with other investigators, and based on the facts set forth herein, there is probable cause that the purpose of these payments was to disguise the source of the funds – changing cash payments for illicit narcotic prescriptions to payments in the form of checks that were associated with fictitious loans.

//

//

//

//

//

//

//

//

//

//

12

## **CONCLUSION**

43.     Based upon the evidence set forth herein, there is probable cause to believe that

MABEL LEONG committed the offense of money laundering, in violation of Title 18, United

States Code, Section 1957.

I declare under penalty of perjury that the statements above are true and correct to the

best of my knowledge and belief.

Jared Lindley
Special Agent, Drug Enforcement Administration

Sworn and subscribed to before me this 8th day of April

HON. ELIZABETH D. LAPORTE
United States Magistrate Judge

13